**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

October 31, 2025

Daniel E. Meyer, Esquire
Bernstein Litowitz Berger
  & Grossmann LLP
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801

Bradley R. Aronstam, Esquire
R. Garrett Rice, Esquire
Ross Aronstam & Moritz LLP
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801

RE: *Chirag Mody v. Steven Aldrich et al.*,
C.A. No. 2025-1147-LWW

Dear Counsel:

This action concerns a $150 million share repurchase program authorized by the Board of Directors of Semrush Holdings, Inc. The plaintiff seeks a temporary restraining order to prevent Semrush from repurchasing shares of its Class A common stock through the repurchase program. The motion is denied.

## I. BACKGROUND

Semrush has a dual-class stock structure, consisting of Class A common stock (one vote per share) and Class B common stock (ten votes per share).[1] Oleg Shchegolev—Semrush's co-founder, director, and largest stockholder—held a

---

[1] Verified S'holder Class Action and Derivative Compl. (Dkt. 1) ("Compl.") ¶ 28.

majority of Semrush's voting power as recently as 2024.[2]  After a series of stock sales, Shchegolev's voting power fell from 50.4% in April 2024 to 46.8% by August 2025.[3]

On July 31, 2025, Semrush's Board authorized Semrush to repurchase shares of its Class A common stock.[4]  The repurchase program was announced on August 4.[5]

Two months later, on October 7, a Semrush stockholder filed this putative class and derivative action.[6]  He asserts two primary harms regarding the repurchase program.

First, he claims that the repurchase program will "use corporate funds to ensure that Shchegolev regains" majority voting control "without spending a penny of his own capital."[7]  He asserts that the Board failed to implement any "restrictions that would prevent an unfair and uncompensated change of control."[8]

---

[2] *Id.* ¶¶ 1, 3, 19, 36.

[3] *Id.* ¶¶ 36, 46.

[4] *Id.* ¶ 53.

[5] *Id.* ¶ 54.

[6] *See id.* ¶ 12.

[7] *Id.* ¶ 1.

[8] *Id.* ¶ 57.

Second, he alleges that the repurchase program will improperly benefit certain directors. Semrush's certificate of incorporation provides that all high-vote Class B shares will automatically convert to Class A shares if the aggregate number of outstanding Class B shares falls below 10% of Semrush's total outstanding stock.[9] The outstanding Class B shares currently represent approximately 14.1% of Semrush's equity.[10] The plaintiff contends that by repurchasing Class A shares, the repurchase program will "delay the sunset" of the Class B shares.[11] The plaintiff insists that this creates a conflict of interest, as four of the nine Board members—Blake, Melnikov, Shchegolev, and Vranesh—own Class B shares and are "directly interested in prolonging their super-voting power."[12]

The plaintiff's complaint was accompanied by a motion to expedite. On October 14, I held a hearing on the expedition motion. The defendants did not appear at the hearing or respond to the motion, and thus the motion was granted as unopposed and on the merits.[13] I held that a preliminary injunction hearing would

---

[9] *Id.* ¶ 30.

[10] *Id.* ¶ 44.

[11] *Id.* ¶¶ 8, 60.

[12] *Id.* ¶ 8.

[13] Order Granting Pl.'s Mot. for Expedited Proceedings (Dkt. 10).

be set in approximately 45 days. I was later informed by the defendants that they were never given notice of the motion because plaintiff's counsel had used an incorrect email address to notify Semrush.[14]

The defendants' counsel appeared in the case on October 17. They filed an affidavit from David Mason, Semrush's Chief Legal Officer, which represented that during the pendency of this litigation, Semrush "will not engage in share repurchases that would cause Shchegolev to obtain voting power that would exceed 49.9% of the total voting power of [Semrush's] outstanding common stock."[15] Still, on October 20, the plaintiff filed the instant motion for a temporary restraining order, seeking to restrict Semrush and its Board from repurchasing shares of Semrush Class A common stock through the repurchase program.[16] The defendants opposed the TRO motion on October 23,[17] and the plaintiff filed a reply in further support of the motion on October 27.[18] After reviewing the papers, I concluded that oral argument was unnecessary.

---

[14] Letter from Semrush's Counsel Regarding Case Schedule (Dkt. 14) 1.

[15] Aff. of David Mason (Dkt. 19) ("Mason Aff.") ¶ 5.

[16] Pl.'s Mot. for TRO (Dkt. 17).

[17] Defs.' Opp'n to Pl.'s Mot. for TRO (Dkt. 25) ("Defs.' Opp'n").

[18] Pl.'s Reply in Further Supp. of Mot. for TRO (Dkt. 29) ("Pl.'s Reply").

## II.    ANALYSIS

A TRO "protect[s] the status quo and [] prevent[s] imminent and irreparable harm . . . pending a . . . final resolution of a matter."[19]  A TRO is an "emergency remedy" that is not granted lightly.[20]  Such injunctive relief may be issued if the movant shows that "it has a colorable claim," "faces a likelihood of imminent, irreparable harm if relief is not granted," and "will suffer greater hardships if the TRO is not granted than the defendants would if the relief were granted."[21]

### A.    Colorable Claim

The plaintiff has met the first element.  A colorable claim is "essentially a non-frivolous cause of action."[22]  The threshold is minimal and used to assess whether a "claim has been made out if the facts alleged are treated as true."[23]

---

[19] *CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007).

[20] *See, e.g.*, *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1227 (Del. Ch. 2022).

[21] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *3 (Del. Ch. May 17, 2018).

[22] *Rsrvs. Dev. Corp. v. Wilm. Trust Co.*, 2008 WL 4951057, at *2 (Del. Ch. Nov. 7, 2008).

[23] *Cottle v. Carr*, 1988 WL 10415, at *2 (Del. Ch. Feb. 9, 1988).

As I explained in ruling on the motion to expedite, the plaintiff has a colorable breach of fiduciary duty claim.[24] He alleges that the repurchase program is designed to entrench the Board's high-vote insiders by delaying the sunset trigger on their Class B shares.[25] He also alleges that the program serves the personal interests of Shchegolev by allowing him to regain majority control with company funds and without paying a control premium.[26]

The defendants offer several counterarguments, including that any allegation that they seek to delay the sunset trigger is irreconcilable with their stock ownership in Semrush's latest proxy.[27] But these arguments go to the merits. At this preliminary stage, the court does not weigh evidence or resolve factual disputes.[28]

---

[24] Tr. of Oct. 14, 2025 Oral Arg. on Pl.'s Mot. to Expedite (Dkt. 26) 13.

[25] Compl. ¶¶ 8, 60, 82, 89; *cf. Yasik v. Wachtel*, 17 A.2d 309, 313 (Del. Ch. 1941) (holding that using corporate funds "to enable a particular person or group to maintain . . . voting control" is improper).

[26] Compl. ¶¶ 1, 52, 80, 88; *cf. La. Mun. Police Emps.' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *8 (Del. Ch. July 28, 2009) (denying motion to dismiss regarding claims that a board breached its duty of loyalty by failing to prevent a creeping takeover).

[27] Defs.' Opp'n ¶ 34.

[28] *See Fabiniak v. Dwyer*, 1986 WL 6835, at *2 (Del. Ch. June 12, 1986) ("A proceeding on an application for a temporary restraining order is especially unsuited for the consideration of competing factual allegations.").

### B.     Irreparable Harm

The second element—irreparable harm—proves more challenging for the plaintiff.  Irreparable harm means harm for which money damages will not suffice.[29] The harm complained of must be "imminent and genuine, as opposed to speculative."[30]

As an initial matter, Semrush is currently in a trading blackout period "imposed in September 2025 . . . [that] is not scheduled to be lifted until at least November 10."[31]  Thus, there is no potential harm for another 10 days.

Beyond that, Mason, an officer with the authority to speak on Semrush's behalf, represents that Semrush will not engage in any share repurchase that would cause Shchegolev to obtain voting power that would exceed 49.9%.[32]  The plaintiff now insists that is insufficient, asserting that Semrush could repurchase stock to bring Shchegolev to the 49.9% ceiling, at which point a tiny purchase on the market

---

[29] *See Roseton OL, LLC v. Dynegy Hldgs. Inc*., 2011 WL 3275965, at *17 (Del. Ch. July 29, 2011) (stating that the movant for a TRO "must demonstrate harm for which she has no adequate remedy at law"); *Maplewood Indus., Inc. v. Dep't of Nat. Res. & Env't Control*, 1989 WL 155944, at *4 (Del. Ch. Dec. 7, 1989) ("While monetary loss is certainly harm to the plaintiffs, it is not necessarily irreparable harm.").

[30] *Roseton*, 2011 WL 3275965, at *17.

[31] Mason Aff. ¶ 4.

[32] *Id.* ¶ 5.

would give him majority voting power.[33]  But that fear is pure speculation, which cannot satisfy the irreparable harm requirement.[34]

The plaintiff's arguments about the sunset provision—a distinct theory of harm the Mason affidavit does not address—fare better.  One harm complained of is stronger than the other.

First, the plaintiff alleges that any repurchase of Class A shares, regardless of the effect on Shchegolev's stake, irreparably harms stockholders by delaying the 10% trigger for the Class B sunset and entrenching the directors who hold those high-vote shares.[35]  He asserts that it would be "virtually impossible to undo" any corporate actions taken with that voting power.[36]  This is also speculative, at best.

But, second, the plaintiff cites a separate non-speculative harm: the directors' alleged use of corporate funds to entrench themselves by "wrongful[ly] perpetuat[ing]" their voting power.[37]  For now, that assertion is sufficient to meet the

---

[33] Pl.'s Reply ¶ 12.

[34] *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002).

[35] Pl.'s Reply ¶ 13.

[36] *Id.* ¶ 10; *see Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 143 (Del. Ch. 1975) (finding irreparable harm where funds used for a redemption would be "gone forever" and it would be "impossible" to return to the prior balance of voting power).

[37] Pl.'s Reply ¶ 10.

TRO standard.  The defendants' rebuttal—that insiders would retain control even post-sunset—is a merits-based dispute that relies on what the plaintiff calls "outdated public filings."[38]

### C. Balance of the Equities

Even assuming irreparable harm exists regarding the sunset provision, equity disfavors granting the relief sought.

As the defendants assert, the motion is marked by laches.[39]  "[L]aches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant."[40]  The repurchase program was announced on August 4, yet the plaintiff waited over two months to file this suit.  He then waited nearly two more weeks (until October 20) to file the TRO motion.  He gives no reason for his delay. The "plaintiff has not proceeded as promptly as [he] might [and] has therefore

---

[38] Pl.'s Reply ¶ 8.

[39] Defs.' Opp'n ¶ 29.

[40] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).

contributed to the emergency nature of the application."[41]  Equity will not support emergency relief in such circumstances.

In addition, the TRO sought would bar Semrush from making any stock repurchases while the litigation is pending.  That relief could impose costs on Semrush and disrupt its publicly-announced capital management strategy.  The plaintiff has not, however, offered to post a bond covering these potential losses.[42]

**D.    Scheduling**

The plaintiff has also moved for a scheduling order to impose the expedited schedule I previously granted.[43]  This case remains expedited for the reasons given in my prior ruling.  And, as explained above, both a colorable claim and irreparable harm have been shown.  But the scheduling needs of this case have changed, considering the representations made in the Mason affidavit.

The plaintiff may seek a preliminary injunction if he chooses.  The defendants are also free to move to dismiss the suit, as they say they intend to do.  I prefer to

---

[41] *Moor Disposal Serv., Inc. v. Kent Cnty. Levy Ct.*, 2007 WL 2351070, at *1 (Del. Ch. Aug. 10, 2007).

[42] *See* Ct. Ch. R. 65(c) ("No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant . . . .").

[43] Pl.'s Mot. for Entry of Scheduling Order (Dkt. 18).

hear the motion to dismiss first—and promptly—so that expedited discovery and an injunction hearing can ensue if the motion is denied. The parties are to meet and confer on a proposed case schedule, which must be filed by Tuesday, November 4.[44]

## III.   CONCLUSION

The plaintiff's motion for a TRO is denied. Since the plaintiff's proposed scheduling order is stale, it is also denied. The matter remains expedited, however. The parties are asked to confer as to a new proposed scheduling order that incorporates the guidance given above and file it by Tuesday, November 4. Should the parties find themselves unable to agree on a stipulated schedule, they may file competing proposed orders or request a scheduling conference.

Sincerely,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[44] The parties may request additional time to confer if needed. If they cannot agree on a stipulated proposed schedule, they may file competing proposed orders and I will choose one. Or they may request a scheduling conference. Please ensure that any schedule includes a hearing date provided by chambers.