# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIXTH STREET PARTNERS MANAGEMENT COMPANY, L.P., SIXTH STREET PARTNERS, L.P., and SPECIAL SITUATIONS GP, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 2021-0127-MTZ |
| DYAL CAPITAL PARTNERS III (A) LP, DYAL CAPITAL PARTNERS III (B) LP, NB DYAL ASSOCIATES III LP, NB DYAL GP HOLDINGS LLC, DYAL III SLP LP, NB ALTERNATIVES GP HOLDINGS LLC, NB ALTERNATIVES ADVISERS LLC, NEUBERGER BERMAN AA LLC, and NEUBERGER BERMAN GROUP LLC, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**WHEREAS**, having considered the Motion for Preliminary Injunction (the "Motion") filed by Plaintiffs Sixth Street Partners Management Company, L.P., Sixth Street Partners, L.P., and Special Situations GP, LLC (collectively, "Sixth Street" or "Plaintiffs"), and related briefing, it appears that:[1]

---

[1] Citations in the form of "Pls.' Ex. —" refer to the exhibits attached to the Transmittal Declaration of Eliezer Y. Feinstein, Esq. in Support of Plaintiffs' Opening Brief in Support of Motion for Preliminary Injunction, available at Docket Item ("D.I.") 160 through D.I. 171, and D.I. 173 through D.I. 175. Citations in the form of "Defs.' Ex. —" refer to the

1

A.    Dyal Capital Partners ("Dyal") is a division of defendant Neuberger Berman Group LLC ("Neuberger"), an investment management company with over $400 billion of assets under management.[2] Dyal manages funds that acquire passive minority equity stakes in other private investment firms, referred to as "partner managers."[3] The funds raise money primarily from outside investors, including pension funds, insurance companies, and foundations.[4] Dyal has established five such funds (Dyal I through V, collectively, the "Dyal Funds"), which have made passive minority equity investments in fifty partner managers.[5]

---

exhibits attached to the Transmittal Declaration of Daniel M. Rusk in Support of Dyal Defendants' Answering Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, available at D.I. 198 through D.I. 207. Citations in the form of "[Name] Dep. —" refer to deposition testimony in the record.

[2] Defs.' Ex. 23 at NB_0002295. Neuberger is a Delaware LLC headquartered in New York, which holds the various subsidiaries that have also been named as defendants in this action. Neuberger holds all of the interests of Neuberger Berman AA LLC. *See* Defs.' Ex. 48 at NB_0008678. Neuberger owns 99.999% of the interests of non-party NB Alternatives Holdings LLC, which in turn holds all of the interests in defendants NB Alternatives GP Holdings LLC and NB Alternatives Advisers LLC. *See id.* NB Alternatives GP Holdings LLC owns the general partners of various other entities involved in alternative investing. *See* Komaroff Dep. 52–53. NB Alternatives Advisers LLC is the registered investment advisor for the Dyal Funds, as well as other funds under the Neuberger corporate structure. *See* Defs.' Ex. 48 at NB_0008678.

[3] *See* Defs.' Ex. 4 at 258–59 [hereinafter "Proxy"]; Pls.' Ex. 18 at DYAL_00011439; Pls.' Ex. 51 at NB_0007802.

[4] Proxy at 258.

[5] *Id.* at 260–61.

B.  The Dyal Funds are limited partnerships.  The investors (the "Dyal LPs") hold economic ownership of the Dyal Funds.[6]  General partner entities (the "Dyal GPs") manage the Dyal Funds, but hold no economic rights or interests.[7] Through the Dyal Funds' limited partnership agreements, the Dyal LPs appoint the Dyal GPs.[8]  The Dyal GPs are owned and controlled by various Neuberger entities, with ultimate control lying with Neuberger itself.[9]  Through the upward chain of ownership and control from the Dyal GPs, Neuberger possesses "complete control of the management and conduct of the business of" the Dyal Funds,[10] including the power to "exercise all rights of the Partnership with respect to [its] interest in any Person, firm, corporation or other entity."[11]  Partner managers are not parties to the limited partnership agreements.

C.  Dyal Capital Partners III (A) LP and Dyal Capital Partners III (B) LP operate collectively as one Dyal Fund known as "Dyal III."  Dyal III is managed by one of the Dyal GPs, Dyal Fund III GP ("Dyal III GP").[12]  Dyal III GP is directly

---

[6] *See id.* at 258–59, 261; Ward Dep. 61; Defs.' Ex. 5 § 5.02(a) [hereinafter "Dyal III LPA"].

[7] Ward Dep. 61–62; Dyal III LPA §§ 3.01, 3.02, 5.02(a).

[8] *See* Dyal III LPA § 3.01.

[9] *See* Defs.' Ex. 44; Defs.' Ex. 48 at NB_0008678.

[10] Dyal III LPA § 3.01.

[11] *Id.* § 2.09(f); *see id.* § 3.01.

[12] *See id.* § 3.01 ("The General Partner shall be vested with the complete control of the management and conduct of the business of the partnership and the other entities comprising the Fund."); *id.* § 3.02 (vesting General Partner with various powers).

3

owned and controlled by NB Dyal GP Holdings LLC ("Dyal Holdings"), which is in turn directly owned and controlled by NB Alternative GP Holdings LLC ("Transferor"), and ultimately owned and controlled by Neuberger.[13]

D.    Sixth Street is one of Dyal III's ten partner managers. Sixth Street is a private investment firm with over $50 billion in assets under management. It focuses on special situations investments, raising capital from outside investors to provide complex credit solutions to companies around the world.[14] Sixth Street also has a smaller direct lending business that makes direct loans to middle market companies.[15] Of Sixth Street's 15 to 20 investment funds, only two focus principally on direct lending.[16]

E.    Sixth Street and Dyal began exploring Dyal III's potential investment in Sixth Street in 2016. According to Sixth Street, the purpose of the deal was to obtain "growth capital" to allow Sixth Street to "continu[e] to grow [its] business."[17] The parties negotiated Dyal III's investment over six months.[18] On June 16, 2017, the parties executed an Amended and Restated Equity Subscription and Investment

---

[13] *See* Defs.' Ex. 44.

[14] *See* Defs.' Ex. 24 at SS_0017086; Stiepleman Dep. 85–86; Rees Dep. 141–42.

[15] *See* Stiepleman Dep. 85–86, 91–92; Rees Dep. 141.

[16] *See* Stiepleman Dep. 91–92; *see also* Pls.' Ex. 18 at DYAL_00011481.

[17] Easterly Dep. 54; *see also* Muscolino Dep. 53.

[18] *See* Stiepleman Dep. 120–121.

Agreement (the "Investment Agreement") under which Dyal III invested approximately $417 million in Sixth Street.[19]

a. Through the Investment Agreement, Dyal III became "a passive minority investor that's not involved in the day-to-day actions of [the Sixth Street] managers."[20]

b. In exchange for its investment, Dyal III acquired certain economic "Interests," defined as an equity interest in Sixth Street and attendant cash flows.[21] Dyal III also acquired limited noneconomic rights to ensure its investors are treated equitably and paid in accordance with the Investment Agreement's terms.[22] These include, *inter alia*, the right to consent to (1) changes in Sixth Street's capital structure that would "disproportionately and adversely" affect Dyal III; (2) business transactions in which Dyal III would not participate pro rata; and (3) "material" related-party transactions.[23]

---

[19] *See* Defs.' Ex. 1 [hereinafter "IA"].

[20] Ward Dep. 227; *see also* Defs.' Ex. 28 at SS_0008972 (explaining to Sixth Street's senior team that it was "important to know" that under the Investment Agreement, "we continue to run the business as we currently run it; Dyal has very few rights as a minority holder"); Defs.' Ex. 29 at SS_0023712 (emphasizing that Sixth Street "retains full control of the business and the investment does not affect the way [it] raises and deploys capital").

[21] *See* IA § 2.1 & Recitals.

[22] *See id.* § 6.5.

[23] *See id.* § 6.5(i)–(vii); *see also id.* § 2.8 (identifying rights to receive certain information about Sixth Street's business on a periodic basis); *id.* § 61.3 (issuing tag-along and drag-along rights in connection with equity transactions initiated by Sixth Street); *id.* § 6.10(b) (granting rights to enforce restrictive covenants, including noncompete restrictions, against

c.      Dyal III also acquired a limited information right, entitling it to Sixth Street information to monitor and value its investment.[24]  Sixth Street must provide Dyal III with certain financial information:  balance sheets, income statements, statements of cash flows, annual and quarterly investor reports, and Sixth Street's principals' compensation.[25]  Sixth Street executives have acknowledged that none of the information it supplies to Dyal is "competitively sensitive . . . in any real sense,"[26] as it is historical and therefore would not allow a competitor to "move[] against [Sixth Street] or decide[] to get in on a deal that [Sixth Street] w[as] working on."[27]

d.      Dyal III GP ultimately controls and wields Dyal III's noneconomic rights under the Investment Agreement.[28]  Dyal III GP's decisions with respect to those rights are made by Dyal Holdings, and ultimately Transferor.

---

certain Sixth Street personnel); *id.* § 7.3(a) (granting rights to force a repurchase of the investment in the event of a key person departure from Sixth Street); Defs.' Ex. 28 (explaining that "basically they [Dyal III] need to be treated pro rata 'shoulder to shoulder' with us"); Stiepleman Dep. 160 (agreeing that "any minority controls are of the flavor of treating the holder pro rata").

[24] IA § 2.8; *see also* Ward Dep. 106–07.

[25] IA § 2.8.

[26] Defs.' Ex. 30 at SS_0018583.

[27] Stiepleman Dep. 68; *see also* Ward Dep. 208–09.

[28] *See* Dyal III (A) LPA §§ 2.09, 3.01, 3.02.

e. The Investment Agreement also granted Sixth Street important rights. Relevant here, Section 7.1(b) provides that prior to the tenth anniversary of the investment or a qualified initial public offering, unless otherwise specifically permitted in the Agreement, "no Subscriber may Transfer its Interests in any [Sixth Street] Issuer without the prior written consent of the Manager, which consent may be given or withheld for any reason or no reason" (the "Transfer Restriction").[29]

f. The Investment Agreement defines "Subscriber" as Dyal III, and defines "Interests" as the Subscriber's equity stake and related cash flows.[30] "Transfer" is defined expansively, encompassing any transfer that would "directly or indirectly transfer (whether by merger or sale or any other similar transaction involving an Affiliate) transfer, sell, assign, exchange, hypothecate, pledge, or

---

[29] IA § 7.1(b). Section 7.1(c) adds that, after the ten-year period expires, no "Transfer may be made without the prior written consent of the Manager if such Transferee or any of its Affiliates . . . is, in the reasonable opinion of [Sixth Street], a Competitor," *id.* § 7.1(c)(A), which includes any entity "that materially competes, or that has a division or business line that materially competes, with one or more of the material underlying businesses in which [Sixth Street] [is] engaged," *id.* § 9.1.

And Section 7.2(a) of the Investment Agreement identifies five specific types of "Transfers" that are permitted without Sixth Street's consent. *Id.* § 7.2(a)(i)–(v). Defendants contend that under Sixth Street's theory of this case, the transaction at issue would constitute a "Subscriber Portfolio Sale" under Section 7.2(a)(iv), defined as the Transfer of at least 75% of Dyal III's portfolio of investments and/or the sale of Dyal III itself. *Id.* §§ 7.2(a)(iv), 9.1. Because Sixth Street's theory fails, I do not reach this issue.

[30] *See id.* § 2.1, Preamble, & Recitals; *see also* Defs.' Ex. 19.

7

otherwise encumber or dispose of any interest (pecuniary or otherwise) therein or rights thereto."[31]  "Affiliate" includes any affiliates of Dyal.[32]

g.      Sections 7.1(b) does not, on its face, extend to entities other than Dyal III, which is the only Dyal Fund named as a party to the Investment Agreement. Dyal III did not believe itself capable of binding upstream entities, and Sixth Street never asked that any entity other than Dyal III be made a party to the Investment Agreement.[33]  The Investment Agreement does not contain any provision (1) addressing or restricting a change of control of Dyal; (2) preventing Neuberger or Dyal from competing against Sixth Street, acquiring or being sold to a competitor, or otherwise restricting their business activities in any way;[34] or (3) supplying Sixth Street the right to buy back Dyal III's stake at fair value in the event of a Dyal III change in control, which several other Dyal partner managers did seek and obtain.[35]

h.      Section 6.1.1 of the Investment Agreement similarly restricts Sixth Street from transferring equity.  But unlike the Transfer Restriction limited to

---

[31] IA § 2.1.

[32] *See id.* § 9.1.

[33] *See* Ward Dep. 130; Stiepleman Dep. 116–17; Rees Dep. 201–03.

[34] In fact, Neuberger maintained a direct lending business at the time of Dyal III's investment in Sixth Street, so such a noncompete was impracticable.  *See* Rees Dep. 202–05.

[35] *See* Ward Dep. 245–46.

Dyal III, Section 6.1.1 explicitly imposes additional duties on Sixth Street's "general partner of each of the [Sixth Street] Issuers" as "Manager."[36]

      F.     On December 23, 2020, Neuberger announced that it had entered into a business combination agreement ("BCA") to merge its Dyal division with Owl Rock Capital Group ("Owl Rock") and a special purpose acquisition company called Altimar Acquisition Corporation ("Altimar") (the "Transaction").[37] The resulting entity would be a new publicly traded company called Blue Owl Capital Inc. ("Blue Owl"),[38] which intends to pursue "enhanced origination opportunities for [Owl Rock's] direct lending businesses through ownership relationships in [Neuberger's] GP Cap Solutions business."[39] The Dyal Funds have advised their limited partners that "Blue Owl and its affiliates are expected to compete (through the historic Owl Rock business) with certain current . . . partner managers."[40]

      a.     The mechanics of the roughly $12.5 billion Transaction are undisputed. The entire Dyal business is transferring to Blue Owl via the entities that control and manage the Dyal Funds.[41] Blue Owl Capital GP, a wholly owned

---

[36] IA § 6.1.1 & Recitals. Section 6.1.1 also binds Sixth Street's "Founders" personally. *See id.* § 6.1.1 & Signature Pages.

[37] *See* Proxy at 13.

[38] *See id.*

[39] Pls.' Ex. 26 at 3.

[40] Pls.' Ex. 68 at DYAL_00020667.

[41] *See generally* Pls.' Ex. 5; Proxy.

9

subsidiary of Blue Owl, will serve as the general partner to two limited partnerships: Blue Owl Holdings and Blue Owl Capital Carry.[42] Transferor will transfer Dyal Holdings—and its accompanying control over Dyal III GP and therefore Dyal III's Interests and noneconomic rights under the Investment Agreement—to Blue Owl Capital Carry.[43] Blue Owl Capital Carry will also acquire the investment adviser entities that manage the Dyal Funds' investments.[44] Blue Owl will be co-owned and co-controlled by Owl Rock and Dyal principals.[45]

b. Dyal III is not a party to the BCA and is transferring nothing in the Transaction. Rather, the Transaction only involves Dyal III's "upstairs" entities, and only the ownership of Dyal GP will change. The legal and economic relationships between Sixth Street and Dyal III, and between Dyal III and its investors, will not change.[46]

G. Owl Rock is a credit manager that specializes in direct lending solutions to middle-market companies backed by private equity sponsors.[47] Thus, Owl Rock's

---

[42] *See* Proxy at 127.

[43] *See* Pls.' Ex. 21 at DYAL_00012015 ("CHANGE IN OWNERSHIP: The Blue Owl transaction results in . . . an indirect change of control of the Fund's non-economic general partner."); *see also* Defs.' Ex. 25; Defs.' Ex. 32; Pls.' Ex. 5; Pls.' Ex. 9.

[44] *See* Proxy at 127.

[45] *See, e.g.*, Pls.' Ex. 5.

[46] *Compare* Defs.' Ex. 44, *with* Defs.' Ex. 25 at 97.

[47] Proxy at 248.

business overlaps with the business of two Sixth Street funds. Thus, the Transaction will transfer control of the Dyal Funds—and therefore control of Dyal III's rights and obligations *vis-à-vis* Sixth Street—to an entity partially owned and controlled by Owl Rock, which competes with a small segment of Sixth Street's business.[48]

H.    After learning of the Transaction, in December 2020, Sixth Street's senior executives assured their investors that the Transaction would have "zero impact on our business" because Dyal III was a "completely passive investor" run by "good folks."[49] And importantly, they emphasized that Dyal "[does not] get competitively sensitive information from us in any real sense,"[50] and that "whatever information they [Dyal] get will be manag[ed]" with "informational firewalls."[51] Accordingly, David Stiepleman, Sixth Street's Co-President and Chief Operating Officer, stated that he was "not particularly concerned about the theoretical possibility of [Owl Rock as] a smaller firm in the credit space seeing [Sixth Street's] info."[52] Sixth Street reiterated its lack of concern on multiple occasions,[53] assuring

---

[48] *See* Pls.' Ex. 5 at NB_0000305; Defs.' Ex. 32 at DYAL_00020646.

[49] Defs.' Ex. 30 at SS_0018583.

[50] *Id.*

[51] Defs.' Ex. 33 at SS_0008984; *see also* Stiepleman Dep. 35, 37, 39; Easterly Dep. 120–21; Waxman Dep. 89–90.

[52] Defs.' Ex. 30 at SS_0018583.

[53] *See* Defs.' Ex. 18 at 14–15; Stiepleman Dep. 36–38.

investors that Dyal III was a "[p]assive 10% owner of Sixth Street" and there was "nothing [to be] concerned about at all" with respect to the Transaction.[54]

I.    In January and February 2021, Sixth Street set out to leverage the Transaction to force a buyback of Dyal III's investment.[55]

a.    After telling its investors that the Transaction was no cause for concern, on January 11, 2021, Sixth Street sent a letter to Dyal asserting for the first time that the Transaction required its consent under Section 7.1(b), and voicing concerns about the post-close entity misusing Sixth Street's confidential information.[56]  In response, Dyal provided drafts of an information control policy that would govern information sharing at Blue Owl, which gave Sixth Street the right to consent to any future changes.[57]  Dyal did the same with other partner managers, including a number with credit and lending businesses.[58]  Sixth Street did not respond.[59]

b.    On February 9, Sixth Street demanded a buyback for $417 million—the same price Dyal III paid more than three years earlier—in installment

---

[54] Defs.' Ex. 34 at SS_0025461.

[55] *See* Stiepleman Dep. 48, 78–79; Defs.' Ex. 20 at ML-037; Defs.' Ex. 21 at CL-094.

[56] *See* Defs.' Ex. 35.

[57] *See* Defs.' Ex. 36.

[58] *See id.*; Defs.' Ex. 37; Defs.' Ex. 38; Easterly Dep. 170; Ward Dep. 231–33.

[59] *See* Ward Dep. 233–34, 250–53, 207–09; *see also* Defs.' Ex. 37.

payments over five years, without interest.[60]  Sixth Street's banker, Mark Bradley, told Dyal that Sixth Street would "muck up" the Transaction if Dyal did not accept the take-it-or-leave-it buyback offer within five days.[61]

c.  Dyal believed that Sixth Street's demand undervalued its interest, as Sixth Street's assets under management have nearly tripled since the parties executed the Investment Agreement.[62]  As far back as 2018, Sixth Street estimated its value at $6 billion, implying a $700 million valuation for Dyal III's stake.[63]  Therefore, Dyal rejected the take-it-or-leave-it demand, but explained that it would be willing to engage in good faith buyback negotiations and valuation discussions.[64]  Sixth Street declined to negotiate.[65]

d.  At the same time, Sixth Street was attempting to derail the Transaction via regulatory channels.  Specifically, Sixth Street lobbied the Department of Justice to block the deal based on antitrust concerns, and contacted the SEC regarding the "adequacy of disclosures" relating to the Transaction.[66]  Sixth

---

[60] *See* Defs.' Ex. 39.

[61] Ward Dep. 247–49, 277–78; *see* Rees Dep. 226–28.

[62] *See* Defs.' Ex. 38.

[63] *See* Defs.' Ex. 24 at SS_0017184.

[64] *See* Defs.' Ex. 38.

[65] *See* Ward Dep. 207–09, 250–53.

[66] *See* Defs.' Ex. 17 at 18–19.

Street also lobbied other Dyal partner managers to oppose the deal.[67] Those efforts yielded only one additional dissenting partner manager, Golub Capital ("Golub").

J. Sixth Street filed this action on February 12,[68] and filed an Amended Complaint on February 24.[69] Sixth Street asserts breach of the Transfer Restriction under Section 7.1(b) of the Investment Agreement and tortious interference with contract, and seeks a preliminary injunction enjoining the Transaction.[70] The parties engaged in substantial expedited discovery and briefing.[71] In briefing, Sixth Street narrowed its requested injunctive relief, seeking to "preliminarily enjoin the transfer of the Dyal Funds' interests in Sixth Street."[72] I heard argument on the preliminary injunction on March 24.[73] After argument, Sixth Street again narrowed its request, asking for an order "enjoining the Dyal fund entities and their general partner from transferring the funds' interests in Sixth Street or, in the alternative and at a minimum, enjoining the Dyal fund entities and their general partner from exercising the funds' non-economic rights under the Investment Agreement pending resolution

---

[67] Defs.' Ex. 18 at 12–13.

[68] *See* D.I. 1.

[69] *See* D.I. 40.

[70] *See id.* ¶¶ 93–117.

[71] *See* D.I. 159; D.I. 196; D.I. 197; D.I. 214.

[72] D.I. 159 at 62.

[73] *See* D.I. 253; D.I. 255.

of Plaintiffs' claims."[74] By Dyal's most recent estimation, the Transaction will not close before May 4.[75]

K. On February 23, nearly two weeks after this litigation began, Golub filed a similar lawsuit in New York seeking similar injunctive relief; Sixth Street's counsel represents Golub in that action.[76] After considering Golub's substantially identical transfer restriction, the New York Court denied Golub's requested preliminary injunction on April 5.[77]

L. To obtain a preliminary injunction, the movant must demonstrate (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[78] "This Court has broad discretion to grant or deny a preliminary injunction."[79] But a preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these

---

[74] D.I. 245 at 1–2.

[75] D.I. 256.

[76] *GCDM Hldgs. LP, et al. v. Dyal Cap. P'rs Mirror Aggregator (A) LP, et al.*, No. 651226/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021).

[77] *See* D.I. 250.

[78] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986)); *see also Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987).

[79] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010) (citing *Data Gen. Corp. v. Digit. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972)).

necessary elements. Nevertheless, while some showing is required as to each element, there is no steadfast formula for the relative weight each of these three factors deserves."[80]

**IT IS HEREBY ORDERED**, this 20th day of April, 2021:

1. The Motion is **DENIED**, as Sixth Street has failed to demonstrate entitlement to extraordinary relief.

2. The first element of the familiar injunction test requires that the plaintiff establish a reasonable probability of success on the merits. This standard "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[81] Yet, Sixth Street has failed to make that showing on its breach of contract and tortious interference claims.

a. The critical question at this stage is whether the Transaction has triggered the Transfer Restriction. Thus, the Court is tasked with interpreting its text to determine what the parties intended.[82] "Delaware adheres to the objective theory

[80] *Id.* (alterations and internal quotation marks omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007), and then quoting *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004)).

[81] *Pell*, 135 A.3d at 783 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

[82] *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

16

of contracts, [meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[83] The Court will "give effect to the plain-meaning of the contract's terms and provisions,"[84] "will read a contract as a whole[,] and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[85] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[86]

        b.      The Transfer Restriction's unambiguous language compels an outcome in Defendants' favor. To trigger the Transfer Restriction, a transaction must satisfy three specific and defined components: the subject of the sentence (the Subscriber) must perform a specific action (a Transfer) with the verb's direct object

---

[83] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[84] *Id.* at 1159–60.

[85] *Id.* at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[86] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

(the Interests).[87]   Here, the Subscriber, Dyal III, is transferring nothing in the Transaction, so the Transfer Restriction is not triggered.

c.   This reading is supported by the Delaware Supreme Court's recent decision in *Borealis Power Holdings Inc. v. Hunt Strategic Utility Investment L.L.C.*[88]  There, the Supreme Court considered whether a right of first refusal over a "Minority Member's" transfer of its LLC Units was implicated by the sale of an interest in the Minority Member itself.[89]  The Court concluded it was not, as the trigger was a Minority Member transferring its units, which did not occur when a Minority Member's owner sold its interest in the Minority Member.[90]  The analysis was governed by the "subject" of the right of first refusal, *i.e.* the "Minority Member."[91]  Actions by a different subject, *i.e.* the owner, could not trigger the refusal right.[92]

d.   This Court recently applied this rationale in *Sheehan v. AssuredPartners, Inc.*[93]  Judge LeGrow, sitting as Vice Chancellor, considered whether a tag-along right tethered to "sell[ing] or otherwise Transfer[ing] all or any

---

[87] IA § 7.1(b).

[88] 233 A.3d 1 (Del. 2020).

[89] *See id.* at 9–10.

[90] *See id.*

[91] *See id.*

[92] *See id.*

[93] 2020 WL 2838575 (Del. Ch. May 29, 2020).

18

number of its Class A-1 Units" was triggered by a downstream transaction involving an indirect transfer of those units.[94] Relying on *Borealis*, the Court concluded that the tag-along was not triggered, as the provision's subject was dispositive and the subject was not transferring or selling its units in the challenged transaction.[95]

e.  Here, the Transfer Restriction is triggered only by the Subscriber's Transfer of its Interests in Sixth Street, which will not occur in the Transaction. Dyal III is not transferring any Interests. The Transfer Restriction applies only when Dyal III is doing the transferring, so an upstairs sale of control over Dyal III GP cannot trigger it.[96] Dyal III, the Subscriber, is not a party to the Transaction and its investment in Sixth Street is unchanged. The Transaction does not trigger the Transfer Restriction.[97]

f.  Despite the Transfer Restriction's plain language, Sixth Street argues the parties intended the Transfer Restriction to bind Dyal III's upstairs entities and restrict their actions. Sixth Street relies on the definition of "Transfer," pointing out that it expansively reaches any "direct or indirect transfer" involving Dyal III's Affiliates. But *Borealis* instructs this approach is improper, as it "elide[s] the *subject* of the operative sentence" in Section 7.1(b), of which the verb "Transfer" serves as

---

[94] *Id.* at *12–13.

[95] *See id.*

[96] *See Borealis*, 233 A.3d at 9–10.

[97] *See id.*; *Sheehan*, 2020 WL 2838575, at *12–13.

19

the predicate.[98]  "That subject is not accidental or unimportant."[99]  If a transfer is not performed by the Subscriber, it does not matter whether the transfer is a "Transfer" under the Investment Agreement.  "Put another way, the fact that the [Transfer Restriction] is only triggered by transfers by the [Subscriber] is dispositive in [Defendants'] favor regardless of whether the [Transaction] could be said to effect an indirect transfer of [the Interests]."[100]  "Subscriber," as the subject of the operative sentence, sets the initial scope of the Transfer Restriction, making it "unnecessary" and "inappropriate" to parse the definition of "Transfer."[101]

        g.     Sixth Street's interpretation would have the Court enjoin a transaction at any level of Dyal's corporate pyramid, regardless of whether that entity was explicitly bound by the Transfer Restriction.  This runs afoul of Delaware's well-settled respect for and adherence to principles of corporate separateness and freedom of contract, especially in the hands of sophisticated parties that could have expressly bound Dyal III's upstairs entities if doing so reflected their

---

[98] *Borealis*, 233 A.3d at 10 (emphasis in original).

[99] *Id.*

[100] *Id.* at 9.

[101] *Id.* at 10.

20

intended agreement.[102] They did not do so, and the subject of the Transfer Restriction—Subscriber—is dispositive.

h. Consequently, Sixth Street has also failed to demonstrate a reasonable likelihood of success on its tortious interference claim. A defendant tortiously interferes with a contract under Delaware law when (1) there is a contract, (2) about which defendant knew, and (3) the defendant's intentional act is a significant factor in causing a contract breach (4) without justification (5) injuring plaintiffs.[103] Because Sixth Street has failed to demonstrate a likelihood of success on its breach of contract claim, it cannot demonstrate a likelihood of success on its claim that any breach was the result of tortious interference.

3. Sixth Street has also failed to make a clear showing of irreparable harm that justifies the extraordinary relief of a preliminary injunction. "Irreparable injury is an indispensable and essential factor in determining whether to grant injunctive relief,"[104] and an injunction "should not be issued in the absence of a clear showing

---

[102] *Cf.* IA § 6.1.1 (imposing responsibility and restrictions on Sixth Street's Manager and Founders with respect to equity transfers).

[103] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *25 (Del. Ch. Nov. 17, 2014).

[104] *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at *4 (Del. Ch. June 7, 2010) (citing *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989) (denying a motion for a preliminary injunction where plaintiffs did not demonstrate "the *sine qua non* of preliminary injunctive relief: the threat that irreparable harm will befell them . . . unless an injunction issues")).

of imminent irreparable harm to the plaintiff."[105]  Even assuming the movant has made a sufficient showing on the merits,

> the extraordinary remedy of preliminary injunction will issue only where the court is persuaded that the plaintiff is threatened with irreparable harm that will occur before the matter can be determined at trial, and that the harm that plaintiff seeks to avoid outweighs the risk of injury that may befall the defendant in the event the injunction is entered.[106]

"To demonstrate irreparable harm, a plaintiff must present an injury of such a nature that no fair and reasonable redress may be had in a court of law and must show that to refuse the injunction would be a denial of justice.  The alleged injury must be imminent and genuine, as opposed to speculative."[107]

a.      Sixth Street has asserted the Transaction will irreparably harm it because it will give Owl Rock, a minimal competitor, two valuable types of assets: (1) Sixth Street's "competitively sensitive information," and (2) Dyal III's "material noneconomic rights" in the Investment Agreement, to be wielded by Dyal's GP as

---

[105] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 513 (Del. Ch. 2010).

[106] *Tigani*, 2010 WL 2367669, at *4 (quoting *Kingsbridge Cap. Gp.*, 1989 WL 89449, at *4).

[107] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *4 (Del. Ch. May 17, 2018) (quoting *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002)).

controlled by Dyal Holdings, as controlled by Blue Owl Capital Carry.[108] The record undermines both positions.

b.    First, upon learning about the Transaction, Sixth Street assuaged its investors that the information it provides Dyal III is not competitively sensitive, and the Transaction was of no moment.[109] Just one day before filing this lawsuit, Josh Easterly, the CEO of Sixth Street's direct lending business, stated that Sixth Street "d[id]n't care about the information [and] d[id]n't think Owl Rock is a competitor."[110] And when Sixth Street began contending its information was at risk, Dyal and Owl Rock offered to implement information controls to mitigate any risk that the post-closing entity would misuse or abuse Sixth Street's competitively sensitive information, but Sixth Street refused to engage.

c.    Since filing, nothing in the record indicates Sixth Street ever actually became concerned about its confidential information. Rather, the record further undermines Sixth Street's purported irreparable harm. In his deposition, Alan Waxman, Sixth Street's CEO, testified that "[Blue Owl is] not getting our pipeline. They're not going to be involved in our investment process."[111] Sixth Street acknowledged that "[Dyal] would be crazy" to disfavor any one partner

---

[108] D.I. 159 at 54, 56.

[109] *See, e.g.*, Ex. 30.

[110] Ward Dep. 209.

[111] Waxman Dep. 87.

23

manager, as the success of Dyal's business depends on the success of all 50 of its partner managers,[112] and that misuse of partner managers' confidential information "would kill [Dyal's] business."[113] Sixth Street's concerns about misuse of its confidential information in the hands of a competitor are speculative at best and cannot support a preliminary injunction.

          d.     Nor can Sixth Street's concerns about Dyal III's noneconomic rights, which are designed to protect Dyal III's investment.[114] When Sixth Street announced Dyal III's investment, it was firm in its position that Dyal III would retain a "~10% passive interest in [Sixth Street]" and that "[Sixth Street] retains full control of the business and the investment does not affect the way [it] raises and deploys capital."[115] Sixth Street reaffirmed this position after the Transaction was announced, telling its limited partners that Dyal III is the "[p]assive 10% owner of Sixth Street, nothing [to be] concerned about at all; will remain passive."[116] While Dyal III has some noneconomic rights, the record undermines Sixth Street's

---

[112] Stiepleman Dep. 184–86.

[113] *Id.* 110–11.

[114] *See* D.I. 159 at 54–55.

[115] Defs.' Ex. 29 at SS_0023712.

[116] Defs.' Ex. 34 at SS_0025461.

litigation position that those rights are so significant that passing effective control over them to an Owl Rock co-owned entity will irreparably harm Sixth Street.

        e.      Sixth Street has failed to make a clear showing of imminent irreparable harm to support a preliminary injunction.[117]

        4.      Finally, the balance of the equities favors Defendants. The Court must "balance the plaintiff's need for protection against any harm that can reasonably be expected to befall the defendants if the injunction is granted."[118] The Court

> must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.[119]

---

[117] To the extent Sixth Street relies on the irreparable harm stipulation in Section 10.11 of the Investment Agreement, *see* D.I. 159 at 53, the parties to the Transaction are not bound by that term. *See Weygant v. Weco, LLC*, 2009 WL 1351808, at *4 (Del. Ch. May 14, 2009) (stating that the law will "not extend[] the rights and obligations of contracts to parties that did not execute them, absent special circumstances"). And even if they were, an irreparable harm stipulation "does not deprive the Court of its discretion with respect to one of the critical forms of equitable relief," *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2016 WL 787929, at *2 (Del. Ch. Feb. 19, 2016), or "force the Court's hand," *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *15 (Del. Ch. Mar. 16, 2011). Where the facts "do not warrant a finding of irreparable harm, this Court is not required to ignore those facts." *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2012 WL 6681994, at *4 n.49 (quoting *Kansas City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003)).

[118] *CBS Corp.*, 2018 WL 2263385, at *5 (quoting *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)).

[119] *Id.* (alterations and internal quotation marks omitted) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 839 (Del. Ch. 2011)).

a. Sixth Street's contention that the Transaction "would force Sixth Street into an unwanted marriage with a direct competitor in clear breach of Sixth Street's contractual rights" is hollow.[120] The record indicates that this litigation and the parallel action in New York were part and parcel of a calculated effort to "muck up" the Transaction to force a buyback. After admitting the Transaction was not concerning, Sixth Street saw opportunity in it. Sixth Street sought to impede the bargain between Dyal III's upstairs entities and Owl Rock and secure a lowball buyback of Dyal III's investment. When those efforts failed, Sixth Street filed this litigation, months after the Transaction was announced. Sixth Street also threatened the Transaction through other administrative avenues.

b. Sixth Street's pursuit of a below-market buyback of Dyal III's original $417 million investment threatens the interests of a panoply of parties interested in the $12.5 billion Transaction, including Neuberger and Owl Rock investors who are in no way implicated in Sixth Street's relationship with Dyal III.[121]

---

[120] D.I. 159 at 1.

[121] *See, e.g.*, Ward Dep. 254 ("[T]here are all sorts of different things that could happen that could derail this transaction and cause . . . quite literally billions of dollars of lost value to Dyal's investors . . . .").

The balance of the equities counsels against an injunction in Sixth Street's favor.

The Motion is denied.

/s/ Morgan T. Zurn
Vice Chancellor Morgan T. Zurn
