**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 26, 2026

Gregory V. Varallo, Esquire
Bernstein Litowitz Berger &
Grossmann LLP
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801

Kevin R. Shannon, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware 19801

Rudolf Koch, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

RE: *HoldCo Opportunities Fund V, L.P. v. Arthur G. Angulo, et al.*,
Civil Action No. 2025-1360-MTZ

Dear Counsel:

As you know, on January 23, 2026, I entered an order denying the plaintiff's highly expedited motion for a temporary restraining order enjoining the closing of a stock-for-stock merger (the "Merger") between defendants Fifth Third Bancorp ("Fifth Third") and Comerica Incorporated ("Comerica," and together with Fifth Third and certain Comerica fiduciaries, "Defendants").[1] That order promised my explanation would follow before the Merger's scheduled closing date of February 1.[2] This is that explanation.

---

[1] *See* Docket item ("D.I.") 75; D.I. 95. Citations in the form of "POB __" refer to Plaintiff's Opening Brief in Support of Emergency Motion for a Temporary Restraining Order, available at D.I. 75. Citations in the form of "DAB __" refer to Defendants' Corrected Answering Brief in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order, available at D.I. 86. Citations in the form of "PRB __" refer to Plaintiff's Reply Brief in Further Support of Emergency Motion for a Temporary Restraining Order, available at D.I. 88.

[2] D.I. 95; *see* D.I. 65.

## I.  BACKGROUND

Plaintiff HoldCo Opportunities Fund V, L.P. ("HoldCo") is a Comerica stockholder and an activist.  In July 2025, HoldCo began agitating for a Comerica sale.  That summer, it published a presentation calling for the Comerica CEO's termination, pushing the Comerica board to consider a sale, and identifying three acquirors that "[m]a[d]e [s]ense" to HoldCo—including Fifth Third.[3]  HoldCo pitched Fifth Third as the acquiror that could offer the highest premium.[4]

In September 2025, Comerica started a sale process.  Of the four potential buyers Comerica's financial advisor surveyed,[5] Comerica engaged with two of them: Fifth Third and "Financial Institution A."[6]  Financial Institution A initially proposed an all-stock merger valuing Comerica between $78 and $82 per share.[7]  After Comerica indicated the proposal "was unlikely to be attractive" to the Comerica board, Financial Institution A submitted a revised proposal, conditioned on exclusivity, valuing Comerica between $80 and $84 per share.[8]  The Comerica board concluded Financial Institution A's proposals were "insufficient to grant exclusivity" and "unlikely to be more attractive" than offers by other parties.[9]  The Comerica board told Financial Institution A it would review their discussions.[10]  Financial Institution A did not return with another bid.

Meanwhile, Fifth Third's initial verbal proposal valued Comerica between $84 and $87 per share.[11]  This was already higher than both of Financial Institution

---

[3] D.I. 86 Ex. 3 at 29.

[4] *Id.* at 31, 33, 35.

[5] *See* D.I. 86 Ex. 4 at 8–9.

[6] D.I. 86 Ex. 1 [hereinafter "Proxy"] at 75–77; D.I. 43 Ex. B [hereinafter "Proxy Supp."] at 4–7.  The other two potential buyers announced acquisitions of other targets on September 8 and October 27.  *See* DAB at 6 & n.15.

[7] D.I. 86 Ex. 7 at -0145; Proxy Supp. at 5.

[8] D.I. 86 Ex. 7 at -0145; Proxy Supp. at 5.

[9] D.I. 86 Ex. 7 at -0146–47.

[10] *Id.* at -0146; Proxy Supp. at 6.

[11] D.I. 86 Ex. 10 at -0149; Proxy Supp. at 6.

A's proposals. Comerica pushed for more, and told Fifth Third "the offer price would need to be increased in order for the [b]oard to be supportive."[12] Fifth Third's formal offer, delivered as a written indication of interest, proposed an exchange ratio of 1.8663 to 1.9097 shares of Fifth Third for each share of Comerica; this valued Comerica at $86 to $88 per share at the time.[13] Based on the results of its due diligence, Fifth Third's final offer proposed an exchange ratio of 1.8663.[14] Comerica's financial advisor "expected the transaction to be clearly fair" to stockholders.[15]

Throughout the process, both Financial Institution A and Fifth Third "raised the possibility of a transitional post-closing" role for Comerica's CEO.[16] Fifth Third's final offer proposed post-closing roles for Comerica's CEO and three Comerica directors.[17]

On October 5, 2025, Comerica entered into a merger agreement (the "Merger Agreement") with Fifth Third.[18] The Merger Agreement contemplates a stock-for-stock merger that offered Comerica stockholders a 20% premium to Comerica's 10-day volume-weighted average price at the time of announcement.[19] The Merger would create the ninth-largest bank in the United States.[20]

Comerica and Fifth Third agreed to reciprocal commitments to the Merger with fiduciary outs. Before the stockholder vote, both were bound to a no-shop provision.[21] But each could engage with unsolicited bona fide written acquisition

---

[12] D.I. 86 Ex. 10 at -0149; Proxy Supp. at 6.

[13] D.I. 86 Ex. 10 at -0150; Proxy Supp. at 6.

[14] Proxy Supp. at 8.

[15] D.I. 86 Ex. 13 at -0082; Proxy Supp. at 10.

[16] Proxy Supp. at 5, 6.

[17] D.I. 86 Ex. 11 at -0129; Proxy Supp. at 7.

[18] *See* D.I. 86 Ex. 17 [hereinafter "Merger Agreement"].

[19] Merger Agreement § 1.4; D.I. 86 Ex. 16 at -0047.

[20] *See* D.I. 87 Ex. 30 at 4; D.I. 4 Ex. 4; D.I. 4 Ex. 5; D.I. 4 Ex. 6.

[21] Merger Agreement § 7.13(a).

proposals if the board concluded, in good faith and with legal and financial advice, that failing to do so would violate their fiduciary duties.[22] Both companies were bound to a force-the-vote provision obligating a prompt vote and a recommendation in favor of the Merger Agreement.[23] But if either board determined before the vote, in good faith and with legal and financial advice, that recommending or continuing to recommend the Merger would violate their fiduciary duties, that company could submit the Merger without recommendation and explain to its stockholders the reasons why.[24] If the stockholders of either company voted against the Merger, both companies were bound to use reasonable best efforts to renegotiate.[25]

Comerica and Fifth Third agreed to reciprocal termination rights tracking their commitments and fiduciary outs.[26] If one company changed its recommendation to stockholders, the other could terminate the Merger Agreement.[27] If one company breaches the Merger Agreement, the other can terminate it.[28]

Comerica and Fifth Third also agreed to a $500 million termination fee— roughly 4.7% of the deal's equity value[29]—tracking their commitments and fiduciary outs. If one company pursues an alternative deal and the other company terminates the agreement, the pursuing company must pay that fee.[30] The pursuing company would also owe the fee if it changed its recommendation statement, and the other company terminated on that basis.[31] The pursuing company would owe

---

[22] *Id.*

[23] *Id.* § 7.3.

[24] *Id.*

[25] *Id.* § 7.16.

[26] *Id.* §§9.1(a)–(f).

[27] *Id.* §§ 9.1(e), (f).

[28] *Id.* §§ 9.1(d).

[29] D.I. 46 [hereinafter "Am. Compl."] ¶¶ 9, 92, 96.

[30] Merger Agreement §§ 9.2(b), (c).

[31] *Id.* §§ 9.2(b)(ii), (c)(ii).

the fee if it received a bona fide acquisition proposal, its stockholders did not approve the Merger or the other company terminated for breach, and the pursuing company agreed to a different deal within twelve months of termination.[32]

Comerica and Fifth Third agreed to a one-year outside date, meaning they had until October 5, 2026, to close.[33] During that year, Comerica and Fifth Third were obligated to "use their reasonable best efforts" to secure stockholder approval, file the requisite disclosures, and secure approval from banking regulators.[34]

After the Merger was announced, HoldCo touted it as "a rare win for Bank Activists" and "a successful model."[35] It internally characterized the Merger Agreement's reciprocal no-shop provision, fiduciary out, and termination provisions as "[m]arket," noting the same provisions governed recent bank mergers.[36]

Comerica and Fifth Third filed their joint Form S-4 Registration Statement on November 5.[37] Then HoldCo reversed course. On November 17, HoldCo published a presentation assailing the Merger.[38] On November 21, it sued to enjoin it, including on the grounds that Comerica did not disclose that HoldCo's activism led to the premium Merger.[39]

HoldCo claimed Comerica's fiduciaries disseminated a materially misleading and deficient Registration Statement, and sought to enjoin Comerica's

---

[32] *Id.* §§ 9.2(b)(i), (c)(i).

[33] *Id.* § 9.1(c).

[34] *Id.* §§ 7.4, 8.1, 8.2, 8.3.

[35] D.I. 87 Ex. 23 at 6.

[36] D.I. 87 Ex. 33 at -1780.

[37] *See* Proxy.

[38] *See* D.I. 87 Ex. 24.

[39] D.I. 1 at [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction ¶ 2.

stockholder vote until Comerica provided supplemental disclosures.[40] HoldCo also claimed Comerica's fiduciaries responded to HoldCo's threats by entering into a transaction with a buyer who would retain the CEO, locked up by unenforceable deal protection provisions and in breach of their fiduciary duties.[41] HoldCo contends the force-the-vote provision, the no-shop and fiduciary out, the mandatory renegotiation provision, the one-year outside date, and the 4.7% termination fee locked Comerica into the Fifth Third deal for a year without the right to terminate it for a better deal. HoldCo sought to enjoin closing the Merger—but not the stockholder vote—until Defendants redrafted the Merger Agreement to relax its deal protection provisions.[42] HoldCo also brought an aiding and abetting claim against Fifth Third.[43]

On November 25, I granted expedition and bifurcated the proceedings.[44] We planned to hold a preliminary injunction hearing on HoldCo's disclosure claim on January 2, 2026, and a preliminary injunction hearing on its deal protection claim on February 23.[45] The scheduling order instructed Defendants to provide written notice fifteen days before the Merger's scheduled closing date.[46]

On December 17, Comerica filed a Form 8-K containing supplemental disclosures.[47] HoldCo conceded those disclosures mooted its disclosure claim,[48]

---

[40] D.I. 1 at Verified Stockholder Class Action Complaint for Injunctive Relief and Damages [hereinafter "Compl."] ¶¶ 67–75; 113–17.

[41] *Id.* ¶¶ 76–93.

[42] D.I. 1 at [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction ¶ 2 (seeking to enjoin "the stockholder vote on the proposed merger . . . for a period of at least 10 calendar days after all omitted material facts identified in Plaintiff's motion are disclosed" and "closing the Merger [] for a period of at least 45 calendar days after Defendants amend the Merger Agreement to eliminate the challenged deal-protection provisions").

[43] Compl. ¶¶ 122–24.

[44] D.I. 26; D.I. 29.

[45] D.I. 31.

[46] *Id.* ¶ 3.

[47] *See* Proxy Supp.

and filed an amended complaint dropping that claim on December 22.[49]  The case marched forward.

On January 8, 2026, the Comerica defendants advised that on January 6, its stockholders and Fifth Third's stockholders had approved the Merger.[50]  It was approved by 99.7% of the Fifth Third votes cast and 97% of the Comerica votes cast, representing 73% of Comerica's outstanding stock.[51]  No topping bid had emerged.[52]

On January 13, Fifth Third advised that the Merger had received regulatory approval earlier that day, that "all material conditions to closing under the Merger Agreement" were expected to be satisfied by the end of January 2026," and that the Merger was set to close on February 1.[53]

On January 14, HoldCo filed an emergency motion for a temporary restraining order enjoining the February 1 closing.[54]  The parties briefed the motion

---

[48] *See* D.I. 43 ("Defendant Comerica Incorporated filed a Form 8-K . . . that contains extensive supplemental disclosures which moot Plaintiff's request for an order enjoining the stockholder vote due to disclosure failures.").

[49] *See* Am. Compl.

[50] D.I. 53 at 1–2.

[51] *Id.*

[52] *Id.*

[53] D.I. 65 at 2.

[54] D.I. 75.  HoldCo opened with outrage, asserting the February 1 closing date is a "maneuver[] to short-circuit discovery" into its *Unocal* claim, including into a newly identified potential issue particular to Comerica's CEO.  POB 1–2, 14.  But the Merger Agreement required Comerica and Fifth Third to "use [] reasonable best efforts" to schedule a stockholder vote "as soon as reasonably practicable," and to close the Merger on the "first [] business day of the month" after all conditions are satisfied.  Merger Agreement §§ 7.3, 1.2.  I hope HoldCo simply overlooked these provisions in the heat of the moment, and that this was not dirty pool.  *But see infra* n.98.

One way to read HoldCo's motion is as an ask to enjoin a merger so that HoldCo can obtain more discovery to support its claim to enjoin that merger.  But HoldCo must

by January 16, and I denied it on January 23 with a promise to explain myself before February 1.[55]

## II. ANALYSIS

A TRO is an "extraordinary remedy that should not be issued in the absence of a clear showing of imminent irreparable harm to the moving party."[56] It is "not granted lightly."[57] To obtain a TRO, the movant must show: (i) the existence of a colorable claim; (ii) the threat of imminent and irreparable harm if relief is not granted; and (iii) that the balance of hardships favors the movant.[58] Here, HoldCo must show that the Merger Agreement's deal protection provisions are colorably illegal or inequitable; and that closing a premium deal approved by Comerica's stockholders, in the absence of any other bidder, would irreparably harm those stockholders rather than benefit them. HoldCo fails to clear that high hurdle.

### A. The Merits

HoldCo contends the Merger Agreement "locks up Comerica for a year: the Comerica Board cannot terminate the Merger Agreement to accept a superior proposal" unilaterally, for free, before the one-year outside date.[59] HoldCo asserts

---

meet its burden with what it has now. I have assessed HoldCo's request for relief based on what HoldCo has shown, not what it would like to explore if given the chance.

[55] *See* D.I. 75; D.I. 86; D.I. 88; D.I. 95. I thank the parties for their admirable quick work.

[56] *Trilogy Portfolio Co., LLC v. Brookfield Real Est. Fin. P'rs, LLC*, 2012 WL 120201, at *6 (Del. Ch. Jan. 13, 2012) (citing *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *4 (Del. Ch. Mar. 11, 1999)); *Mody v. Aldrich*, 2025 WL 3048948, at *2 (Del. Ch. Oct. 31, 2025); *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1227 (Del. Ch. 2022).

[57] *Mody*, 2025 WL 3048948, at *2 (citation omitted).

[58] *See, e.g.*, *Sherwood v. Ngon*, 2011 WL 6355209, at *6 (Del. Ch. Dec. 20, 2011); *ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 102 (Del. Ch. 1999).

[59] POB 1.

the deal protections are illegal under 8 *Del. C.* § 141(a) and *Omnicare*,[60] as *per se* invalid constraints on the Comerica board's authority, and unreasonable under *Unocal*,[61] in that they forced upon stockholders a deal that entrenched Comerica fiduciaries in Fifth Third roles.

### 1. Illegality Under Section 141 and *Omnicare*

I begin with illegality. Under Delaware law, contracts "purport[ing] to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties" are "invalid and unenforceable."[62] In the merger context, a board may not "disable[] itself from exercising its own fiduciary obligations at a time when the board's own judgment is most important, i.e., receipt of a subsequent superior offer."[63] For example, "[d]irectors cannot be precluded by the terms of an overly restrictive 'no-shop' provision from all consideration of possible better transactions."[64] Boards are required to bargain for effective fiduciary out clauses permitting them to discharge their managerial authority in fidelity to stockholders.[65] When managerial authority is preserved, the Court will decline to craft a *per se* rule "that the contract is invalid simply because it delimited the range of discretion the directors otherwise had under the law to act."[66]

---

[60] 8 *Del. C.* § 141(a); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 936 (Del. 2003).

[61] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 957 (Del. 1985).

[62] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994) (citing *Wilmington Tr. v. Coulter*, 200 A.2d 441, 452–54 (Del. 1964)).

[63] *Omnicare*, 818 A.2d at 938; *see also ACE Ltd.*, 747 A.2d at 105 ("[A] suitor cannot importune a target board into entering into a deal that effectively prevents the emergence of a more valuable transaction or that disables the target board from exercising its fiduciary responsibilities.").

[64] *Cirrus Hldg. Co. Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1207 (Del. Ch. 2001) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 184 (Del. 1986), and *McMillan v. Intercargo Corp.*, 768 A.2d 492, 502 (Del. Ch. 2000)).

[65] *See Omnicare*, 818 A.2d at 937–38.

[66] *Sample v. Morgan*, 914 A.2d 647, 672 & n.79 (Del. Ch. 2007).

HoldCo's illegality argument mostly relies on the fact that if Comerica pursues a better deal, the right to terminate belongs to Fifth Third, not Comerica, and Comerica has to pay a termination fee. HoldCo complains that "Comerica cannot unilaterally terminate the Merger Agreement until October 5, 2026," and that this structure impermissibly ties the board's hands.[67] This argument overlooks both the terms of the Merger Agreement, and Delaware law.

The Merger Agreement's deal protection provisions are symmetrical. If Fifth Third changed its recommendation and pursued a better deal, the right to terminate belongs to Comerica, not Fifth Third.[68] If Fifth Third pursues a better deal, and Comerica terminates, Fifth Third would owe the termination fee.[69] Before bringing this lawsuit, HoldCo documented this symmetrical structure, noted it appeared in recent bank mergers, and concluded the very provisions it now challenges as "draconian"[70] were "[m]arket."[71]

And this Court has already explained that a fiduciary out need not be coupled with a termination right, or be free of a break fee, to give the board the necessary freedom to exercise its fiduciary duties. *Energy Partners, Ltd. v. Stone Energy Corp.* held a fiduciary out can enable a board to exercise its fiduciary duties even where the other party holds the right to terminate and receive the break fee.[72] *Energy Partners* considered whether that structure in a merger agreement between parties called EPL and Stone, coupled with a seemingly contradictory provision precluding EPL from taking any action to "materially impair"

---

[67] Am. Compl. ¶ 94; *see also* POB at 9–11 ("Comerica could not unilaterally terminate the Merger Agreement until October 5, 2026.").

[68] Merger Agreement § 9.1(e).

[69] *Id.* §§ 9.1(e); 9.2(c)(ii).

[70] POB 9.

[71] D.I. 87 Ex. 33 at -1780 (noting that in seven of nine bank mergers reviewed, "the parties can terminate if (1) both parties consent, (2) it is required by a governmental entity, (3) the other party breaches its duties, or (4) the other party's Board does not advise its shareholders to accept the proposal").

[72] 2006 WL 2947483, at *13–14, *16 (Del. Ch. Oct. 11, 2006).

consummation of the merger, was *per se* invalid under *Omnicare*, *QVC*, and *Quickturn*.[73]  The EPL-Stone merger agreement provided:

> Stone, but not EPL, may terminate the merger if EPL, in reference to a "Third Party Acquisition Proposal," changes its recommendation for the Stone Merger.  The term Third Party Acquisition Proposal is defined under Section 10.1(i) as "an inquiry, offer or proposal" that is "conditioned upon the termination" of the Stone Merger Agreement and "abandonment" of the Stone Merger and in which the third party would acquire 30 percent or more of EPL.  Finally, the Stone Merger Agreement provides that if EPL's stockholders do not approve the Stone Merger in response to a Third Party Acquisition Proposal, EPL must pay Stone a $25.6 million termination fee.[74]

*Energy Partners* observed EPL had the power to change its recommendation to hew to its fiduciary obligations; Stone's "remedy" for EPL's changed recommendation was termination and receipt of the termination fee.[75]  EPL could develop a topping bid and change its recommendation, teeing up Stone's termination and receipt of the fee.[76]  Then the Court concluded the prohibition on material impairment should not be read to inconsistently prohibit EPL from exploring and negotiating a better deal.[77]  The Court concluded "EPL's board, consistent with its fiduciary obligations, could investigate or pursue the Third Party Acquisition Proposal and potentially recommend against the Stone Merger."[78] *Energy Partners* observed that structure reflected the parties' intention to preserve

---

[73] *Id.* at \*10; *see Omnicare*, 818 A.2d at 936–38; *QVC*, 637 A.2d at 51; *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291–92 (Del. 1998).

[74] 2006 WL 2947483, at \*3 (internal citations omitted).

[75] *Id.* at \*14.

[76] *See id.*

[77] *Id.* ("Taken together, these provisions are internally consistent with the plain reading of the Stone Merger Agreement[, which indicates] that . . . EPL's board, consistent with its fiduciary obligations, could investigate or pursue the Third Party Acquisition Proposal and potentially recommend against the Stone Merger.").

[78] *Id.*

the directors' ability to exercise their fiduciary duties,[79] and rejected the argument that EPL's lack of a termination right was motivated by Stone's desire for deal certainty.[80] It concluded the merger agreement permitted exploration of third party proposals, eliminating any basis for a *per se* invalidity challenge.[81]

*Energy Partners* is dispositive of HoldCo's argument that Comerica's fiduciary out is illegal because it is not accompanied by a termination right. Delaware law has already determined that a fiduciary out that allows a merger party to engage with an unsolicited proposal and change its recommendation enables that party's board to fulfill its fiduciary duties, even if the other party holds the right to terminate and is entitled to a fee.[82]

The other terms HoldCo criticizes do not change that conclusion. The termination fee is not oppressive.[83] The costs of breach or Fifth Third's termination are factors Comerica's board could consider in its business judgment.[84]

---

[79] *Id.* at *16.

[80] *See id.* at *15.

[81] *Id.* at *16. The *Energy Partners* merger agreement was actually "unilateral," to use HoldCo's phrase. Either Stone or EPL could terminate the agreement if Stone accepted a superior proposal; only Stone could terminate if EPL changed its recommendation. *Id.* at *14.

[82] *See id.* at *14–16; *cf. In re Complete Genomics, Inc. S'holder Litig.*, C.A. No. 7888-VCL, at 4, 10–11 (Del. Ch. Nov. 9, 2012) (TRANSCRIPT).

[83] The reciprocal $500 million termination fee amounts to approximately 4.7% of the Merger's equity value. *See* Am. Compl. ¶¶ 9, 92, 96. That size is not unreasonable; this Court has upheld fees of similar sizes. *See, e.g.*, *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *9 (Del. Ch. June 30, 2014) ("At 4.5% of the transaction's equity value, it is highly unlikely that the termination fee here was unreasonably high." (citations omitted)); *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *8 & n.50 (Del. Ch. Apr. 11, 2012) (upholding a 4.4% termination fee); *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 86 (Del. Ch. 2007) (upholding a 4.3% termination fee).

[84] *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017) ("Even with an iron-clad contractual obligation, there remains room for fiduciary discretion because of the doctrine of efficient breach."); *In re*

That leaves only HoldCo's criticism that Comerica and Fifth Third agreed to an outside date a year after signing. That alone does not make their symmetrical deal commitments, fiduciary outs, and termination rights illegal. Before the stockholder vote, when those provisions do the most work and the board's judgment is most important, the challenged provisions permitted Comerica's board to exercise its fiduciary duties by entertaining superior proposals and submitting the Merger to stockholders without a recommendation and with an explanation. The one-year outside date does not strip the board of its managerial authority to decide if the Merger is best for stockholders: it defines how long the board must work to close the highly regulated Merger once stockholders approve it.[85]

HoldCo invokes *Omnicare*,[86] *Quickturn*,[87] and *ACE Ltd.*[88] Those cases are readily distinguishable. In *Omnicare*, a set of tripartite defense measures made it "mathematically impossible" and "realistically unattainable" for "any other proposal to succeed, no matter how superior the proposal."[89] They turned the stockholder vote into a *fait accompli*.[90] And they "preclude[d] the *consideration* of any superior transaction."[91] In *Quickturn*, a delayed redemption provision "restrict[ed] the board's power in an area of fundamental importance to the

---

*Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *13–14 (Del. Ch. Dec. 30, 2019); *Wagner v. BRP Grp., Inc.*, 316 A.3d 826, 860 (Del. Ch. 2024).

[85] *Cf. Orman v. Cullman*, 2004 WL 2348395, at *8 (Del. Ch. Oct. 20, 2004) (explaining an 18-month lock-up period, where "it was this deal or nothing, at least for that period of time . . . hardly seems unreasonable, given the absence of other deal protection devices in this particular transaction and given the buyer's understandable concern about transaction costs and market uncertainties").

[86] 818 A.2d at 936–38.

[87] 721 A.2d at 1291–92.

[88] 747 A.2d at 107.

[89] 818 A.2d at 936 (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1388–89 (Del. 1995), and *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1195 (Del. Ch. 1998) (citations omitted)).

[90] *Id.*

[91] *Id.* (emphasis added).

shareholders—*negotiating* a possible sale of the corporation."[92]   It operated to preclude a newly elected board "from *completely* discharging its fundamental management duties to the corporation and its stockholders for six months."[93]   In *ACE Ltd.*, this Court questioned the validity of a no-talk and fiduciary out clause that would effectively strip the board of its ability to "*entertain* and *consider* a superior proposal."[94]

The Comerica board did not "tie its own hands for a year" as HoldCo alleges.[95]   Before the vote, nothing about the Merger was a *fait accompli* or a mathematical certainty.   Nothing prevented Comerica's board from considering, negotiating, or pursuing alternative transactions if it believed, in good faith, that failing to do so would be inconsistent with its fiduciary duties.   Comerica and Fifth Third "agreed to mutually reciprocal provisions to protect the deal from interference."[96]   Our Supreme Court has recognized that reciprocal deal protection provisions, "drafted to protect both [parties] in the event the merger [is] not consummated, [are] an integral part of the merits of the transaction."[97]

## 2.  Inequity Under *Unocal*

HoldCo also asserts the Merger, locked up by its suite of deal protections, constitutes an unreasonable defensive measure.   HoldCo presents an entrenchment theory based on Comerica's CEO securing a post-closing transitional role, and three Comerica directors joining Fifth Third's board.[98]   It asserts Defendants

---

[92] 721 A.2d at 1291–92 (emphasis added).

[93] *Id.* at 1292.

[94] 747 A.2d at 107 (emphasis added).

[95] *See* Am. Compl. ¶ 103.

[96] DAB 17.

[97] *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 50 (Del. 1997); *see also Orman*, 2004 WL 2348395, at *7.

[98] *See* POB 21; D.I. 86 Ex. 11.  HoldCo's amended complaint fixated on the length of and compensation for the CEO's post-closing role. *See* Am. Compl. ¶¶ 79–83.  The Comerica defendants advised HoldCo and the Court that HoldCo's allegations were factually false. *See* D.I. 53 at 2–3.  HoldCo's TRO is mute on that issue.  *See* POB 16–21; PRB 2–9.

rushed into and locked up a transaction—with Fifth Third as a "white knight"—that "will prevent Comerica stockholders from ever having the chance to vote on a new director slate if the Merger closes."[99]  HoldCo again relies on the one-year outside date and Comerica's fiduciary out coupled to Fifth Third's termination right.[100]

*Unocal* enhanced scrutiny "was conceived of as a method to police the inherent conflict present when a board resolves to oppose a takeover bid."[101]  As our Supreme Court observed, "[w]hen a board addresses a pending takeover bid," there is an "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders."[102]  To assuage that concern, the *Unocal* framework asks whether a defensive measure is preclusive or coercive, and "within a range of reasonableness."[103]  The challenged provisions here readily pass muster under that framework: they did not unreasonably preclude an alternative bid or coerce the vote.

As an initial matter, I doubt this transaction was defensive.  HoldCo's alleged proxy threat pushed for a sale, with Fifth Third as the buyer it thought could offer the most value.  Defendants observe that even if the decision to sell was in response to that alleged threat, the decision "was not defensive at all, it was entirely concordant."[104]  And after the Merger, a majority of Comerica's eleven

---

This heightens my concern that HoldCo and its counsel have taken excessive liberties with the facts.  *See supra* n.54; *see also supra* nn.70–71 and accompanying text.

[99] POB 21.

[100] *See* Am. Compl. ¶ 121 ("The Challenged Provisions are 'draconian,' since they . . . coerce Comerica stockholders to approve the Merger, since their failure to do so would leave the Company in limbo for a full year.").

[101] *In re Edgio, Inc. S'holders Litig.*, 2023 WL 3167648, at *7 (Del. Ch. May 1, 2023) (citing *Unocal*, 493 A.2d at 954–55).

[102] *Unocal*, 493 A.2d at 954.

[103] *Unitrin*, 651 A.2d at 1387–88 (quoting *QVC*, 637 A.2d at 45–46).

[104] DAB 37; *see In re TriQuint Semiconductor, Inc. S'holders Litig.*, 2014 WL 2700964, at *2 (Del. Ch. June 13, 2014) ("In order to entrench itself from a potential proxy contest by Starboard, the TriQuint board purportedly agreed to merge with RFMD—a company

directors will lose their seats, and HoldCo will obtain stock in the post-closing entity; it can launch another proxy contest.[105]

But even assuming the sale was defensive because Fifth Third was willing to retain some Comerica top brass, HoldCo cannot show the deal protections were preclusive or coercive. A defensive measure is preclusive "when its operation precludes an acquisition of the company,"[106] or makes "a successful proxy contest . . . 'mathematically impossible' or 'realistically unattainable.'"[107] An alternative transaction was not unattainable here. The Merger Agreement's fiduciary out left Comerica's board free to pursue proposals other than Fifth Third's. And the termination fee was not unreasonable. Put differently, there was a realistic and attainable path for a higher bid.

Nor were the deal terms coercive. A defensive measure is coercive "when it operates to force management's preferred alternative upon the stockholders,"[108] or "caus[es] the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."[109] HoldCo has not seriously argued the Comerica vote was forced upon stockholders.[110] Comerica stockholders had a meaningful ability to vote down the Merger. There were no voting agreements, no naked-no-vote fee, and no other arrangements that locked up the vote.

---

with which it had been considering a transaction for quite some time—in a deal that Starboard supported. These facts do not support a colorable [*Unocal*] claim . . . .").

[105] *See* Merger Agreement § 1.4; Proxy Supp. at 7.

[106] *In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 480 (Del. Ch. 2000) (citing *Unitrin*, 651 A.2d at 1387).

[107] *Toll Bros.*, 723 A.2d at 1195 (quoting *Unitrin*, 651 A.2d at 1389).

[108] *Gaylord*, 753 A.2d at 480 (citing *Unitrin*, 651 A.2d at 1387); *see also Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 601 (Del. 2010) ("A coercive response is one that is aimed at cramming down on its shareholders a management-sponsored alternative." (internal quotation marks and citations omitted)).

[109] *Willaims v. Geier*, 671 A.2d 1368, 1382–83 (Del. Ch. 1996).

[110] D.I. 29 at 45, 47 (observing HoldCo "does not allege the deal protections are structurally coercive").

In *In re Complete Genomics, Inc. Shareholder Litigation*, this Court rejected a *Unocal* challenge to a deal involving substantially similar deal protections, and more: a termination fee amounting to 4.8% of the deal's equity value; no termination right for the target to accept a superior proposal; limitations on the target board's ability to change its recommendation; and a tender and support agreement committing 17.7% of the company's shares to accept the deal.[111] There, as here, the plaintiffs argued the merger agreement violated *Unocal* "because the [target] board [could not] terminate the merger agreement to accept a superior proposal."[112] The Court disagreed.

*Complete Genomics* reinforces the principle that "[i]f stockholders can reject the transaction and maintain the status quo, then the transaction is not coercive."[113] And "[i]f all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty."[114] Here, the Comerica board gave stockholders an option. Comerica's stockholders were free to take the merits of that option—including the termination fee, the absence of a termination out, and the window of time that might be needed to close a large regulated merger—into consideration, and vote for or against it. And because a no vote alone would not trigger payment of the termination fee,[115] stockholders could "freely choose the status quo without penalty."[116]

---

[111] C.A. No. 7888-VCL, at 4, 10–11, 13–14 (Del. Ch. Nov. 9, 2012) (TRANSCRIPT).

[112] *Id.* at 12.

[113] *Id.* at 13–14; *see also id.* ("There may be negative consequences to continuing with the status quo, but neither the existence of those negative consequences nor accurate disclosures about them constitutes wrongful coercion.").

[114] *Id.* at 14 (quoting *AC Acq. Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 113 (Del. Ch. 1986)).

[115] *See* Merger Agreement § 9.2(b).

[116] *Complete Genomics*, C.A. No. 7888-VCL, at 14–15; *see also Brazen*, 695 A.2d at 49–50 (finding that a termination fee was not coercive even when payment of the fee would be triggered upon a failure to obtain stockholder approval, given "the reciprocal termination fee provisions . . . were an integral part of the merits of the transaction").

Because the challenged provisions did not unreasonably limit the Comerica board's ability to pursue an alternative bidder or rob the stockholder vote of its effectiveness, they did not bind Comerica to Fifth Third in a way that supports a colorable entrenchment theory.

HoldCo also sees entrenchment in the Merger price.[117] Again, in the absence of oppressive deal protection measures or a coerced or uninformed vote, I struggle to see how the price could be entrenching. Having acquitted the deal protections of inequitable wrong, I will address the price issue in the context of imminent irreparable harm.

I recognize the colorability standard is not an exacting one.[118] But the merits of HoldCo's claims turn on unambiguous contractual language and dispositive authority. HoldCo has failed to raise a colorable claim warranting injunctive relief.

## B.     Imminent Irreparable Harm

Imminent and irreparable harm is the "*sine qua non* for this form of relief."[119] Before this Court will enjoin a merger in equity, the movant must "demonstrate harm for which she has no adequate remedy at law."[120] "The alleged harm must be imminent and genuine, as opposed to speculative."[121]

HoldCo asserts the Merger Agreement's deal protections chased away would-be topping bidders, depriving Comerica stockholders of the unique opportunity to sell for more value.[122] But HoldCo has not raised a colorable claim

---

[117] POB 20–21.

[118] *See CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007).

[119] *CapStack Nashville 3 LLC v. MACC Venture P'rs*, 2018 WL 3949274, at *3 (Del. Ch. Aug. 16, 2018) (internal quotation marks and citation omitted).

[120] *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *25 (Del. Ch. May 20, 2011).

[121] *In re Inergy L.P.*, 2010 WL 4273197, at *17 (Del. Ch. Oct. 29, 2010) (citing *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002)).

[122] POB 22; PRB 17.

that the challenged provisions had that effect. HoldCo's allegations about a "fire-sale price"[123] can be addressed after closing.

And the facts on the ground do not support HoldCo's theory of imminent and irreparable harm. There has not been another serious and motivated bidder in the process since Financial Institution A, whose last proposal was bested by Fifth Third's.[124] Of the four potential acquirors identified by Comerica's financial advisor, two had taken up alternative transactions before HoldCo's pursuit to enjoin the Merger.[125] HoldCo itself identified only three potential acquirors that "[m]a[d]e [s]ense," and predicted Fifth Third could offer the highest premium of those three.[126] Fifth Third delivered.

HoldCo's assertion about would-be topping bidders rests on speculation. Speculation cannot supply a cognizable harm warranting a TRO.[127] As this Court noted in *In re Synthes, Inc. Shareholder Litigation*, courts should be reluctant to question a board's decision to bargain for deal protection devices based on hypothetical harms—i.e., the harm that "some unexpected bidder will emerge from an unexplored and overlooked dusty corner of our well-scoured capital markets," or that "some party that has already had a chance to make a real bid without having to hurdle any deal protection barrier at all will somehow come to a different realization of the company's value."[128]

And while HoldCo complains of a potential "one-year standoff" until the outside date, there was no cognizable harm in giving Comerica and Fifth Third

---

[123] POB 20–21.

[124] *See* Proxy Supp. at 5–6.

[125] *See* DAB 6 & n.15.

[126] D.I. 86 Ex. 3 at 29, 31, 33, 35.

[127] *See Norberg v. Young's Mkt. Co.*, 1989 WL 155462, at *5 (Del. Ch. Dec. 19, 1989) ("[T]he abstract possibility of a higher offer cannot serve as a predicate for finding plaintiff's harm to be irreparable."); *Roseton OL, LLC v. Dynegy Hldgs. Inc.*, 2011 WL 3275965, at *17 (Del. Ch. July 29, 2011) ("Potential harm that may occur in the future, however, does not constitute imminent and irreparable injury for the purposes of a TRO or preliminary injunction." (citation omitted)).

[128] 50 A.3d 1022, 1049 (Del. Ch. 2012).

time to merge in a highly regulated sector. As it turns out, they did not need much time: the Merger is now days away from closing. The outside date presents no harm to Comerica stockholders.

HoldCo has not shown it, or Comerica stockholders similarly situated to it, will be harmed—let alone suffer imminent irreparable harm—absent a TRO.

## C.    Balance of the Equities

Against this backdrop, I cannot conclude the risk of enjoining the Merger would outweigh the benefit, particularly "when judged from the standpoint of the [Comerica] stockholders."[129] In the merger context, this Court is "particularly reticent . . . to enjoin a transaction that affords stockholders a premium in the absence of a competing offer."[130] That is especially true "where no rival bidder has emerged to complain that it was not given a fair opportunity to bid, and where there is no reason to believe that stockholders are not adequately informed or [were] coerced into accepting the transaction if they do not find it favorable."[131]

Enjoining a premium merger on the eve of closing will introduce substantial delay and uncertainty. While HoldCo mourns a topping bid that never appeared, an injunction may very well deprive stockholders of Fifth Third's certain premium

---

[129] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 617 (Del. Ch. 2010).

[130] *Koehler v. NetSpend Hldgs. Inc.*, 2013 WL 2181518, at *22 (Del. Ch. May 21, 2013); *Kohls v. Duthie*, 765 A.2d 1274, 1289 (Del. Ch. 2000) ("This court is understandably cautious when the issuance of an injunction would deprive . . . shareholders of the benefits of [a] merger transaction without offering them any realistic prospect of a superior alternative, or for that matter, any alternative." (internal quotation marks and citation omitted)); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 208 (Del. Ch. 2007) ("[W]hen this Court is asked to enjoin a transaction and another higher-priced alternative is not immediately available, it has been appropriately modest about playing games with other people's money."); *In re OPENLANE, Inc.*, 2011 WL 4599662, at *10 n.53 (Del. Ch. Sept. 30, 2011) ("Enjoining a merger when no superior offer has emerged is a perilous endeavor because there is always the possibility that the existing deal will vanish, denying the opportunity to accept any transaction.").

[131] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.2d 1049, 1072–73 (Del. 2014).

that they chose to accept.  HoldCo's suggestion that Comerica stockholders would "benefit from the delay" finds no basis in logic or the record.[132]  An injunction will not make a higher offer or a different buyer appear.  At this juncture, as Defendants point out, "the real risk of irreparable harm is not from the consummation of the merger—it is from this motion itself."[133]

### III.   CONCLUSION

HoldCo's motion for a TRO is denied.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc:  All Counsel of Record, via *File & ServeXpress*

---

[132] PRB 12–13.

[133] DAB 3.